**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LUZ CHAVEZ and STEPHEN TAYLOR, individually and on behalf of all others similarly situated, | 22-cv-5924 |
| Plaintiffs, | |
| v. | |
| SCOTT LENNON, Alderman of the 1st Ward of the City of Berwyn, | |
| Defendants. | |

## MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs Luz Chavez and Stephen Taylor, through counsel, respectfully request that this Honorable Court grant a preliminary injunction enjoining Defendant Scott Lennon, Alderman of the First Ward of the City of Berwyn, from continuing to block Plaintiffs from the official Facebook Page he uses to communicate with constituents regarding government functions. In support thereof, Plaintiff states as follows:

## INTRODUCTION

Social media platforms such as Facebook enable ordinary citizens to speak directly to their government representatives and to listen to and debate others about issues of public interest, in much the same way they could if they were gathered on a sidewalk, public park, city council meeting or town hall assembly. As the Supreme Court has recognized, social media platforms such as Facebook are "perhaps the most powerful mechanisms available to a private citizen to make his

or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). These platforms have transformed civic engagement by allowing elected officials to communicate directly with their constituents and receive immediate feedback. "Governors in all 50 States and almost every Member of Congress have set up [social media] accounts for this purpose," allowing citizens to "petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 1735.

Scott Lennon, the Alderman of the City of Berwyn's 1st Ward, has established an official Facebook Page through which he communicates with his constituents about government functions on a daily basis. The Page has approximately 3,000 followers, many of whom participate in the comments sections that appear under Alderman Lennon's posts, expressing opinions, asking questions, and engaging in debate. In an effort to suppress dissent in this forum, Alderman Lennon blocks individuals whom he perceives as critics or political opponents from interacting with the Page.

Plaintiffs Luz Chavez and Stephen Taylor are politically engaged residents of Berwyn who have been critical of Alderman Lennon and the positions he has taken on political issues of importance to them. Alderman Lennon has blocked them and other activists in the community from his Facebook Page.

As shown below, Alderman Lennon's blocking Plaintiffs violates the First Amendment in two ways: (1) it is content-based regulation of speech; and (2) it imposes a viewpoint-based burden on their right "to petition the Government for a redress of grievances." U.S. Const. Amdt. I.

# FACTUAL BACKGROUND

## I. Facebook Pages

In addition to allowing users to create personal profiles to interact with others on the site, Facebook allows users to create "Pages," public-facing profiles used by brands, companies, government officials, and other public figures to interact with the public. Facebook users can control the privacy of their personal profiles by making them visible only to select audiences, *e.g.*, users they've added as "friends" or smaller subgroups of friends defined by the user. In contrast, Pages are inherently public. Anyone on or off Facebook can view the posts and comments on Pages. Anyone with a Facebook account can interact with a Page (*e.g.*, comment on posts; link to the Page in their own posts; ask questions; or send a message).

The Page administrator's posts appear in a feed on the Page's front page. Visitors to the Page can post comments beneath any posts unless the Page administrator has disabled commenting. *See* Exhibit 1, Screenshot of Ald. Lennon Facebook Page, at 1.

Facebook also enables other users to "tag" Facebook Pages on posts they make on their own Facebook accounts. When a Page is "tagged" by a Facebook user, Facebook sends a notification to the Page administrator and the post in which the Page is tagged appears in the "Mentions" tab of the Page, which is visible to visitors to the Page. Ex. 1 at 2.

A Page administrator can control who can interact with his or her Facebook Page by adding individuals to a "blocked" list. When an individual is "blocked" by a Page, the individual cannot interact with the Page at all—he or she cannot comment on the Page administrator's posts on the Page, respond to others' comments on the Page, tag the Page, or send the Page a direct message.

## II.     Alderman Lennon's Facebook Page

Defendant Alderman Lennon has created a Page for his work as the Alderman of Berwyn's 1st Ward. His Page appears at the URL https://www.facebook.com/scottlennonfor1stward. *See* Ex. 1 at 1. The Page is separate from Lennon's personal Facebook account. The Page description set forth on the Page states as follows: "Scott is here to listen and to find realistic compromises that embrace progress for his neighbors." *Id*. The Page provides contact information for his Ward Office, his office phone number and his City of Berwyn email address (slennon@ci.berwyn.il.us). *Id*. The Page title is "Scott Lennon Berwyn's 1st Ward Alderman." The Page is categorized as belonging to a "Politician." *Id*.

Defendant Alderman Lennon uses his official Facebook Page to communicate with his constituents about a variety of government functions. In recent posts he has shared information about recent arrests by the Berwyn Police Department; invited citizens to contact him in anticipation of an upcoming City Council meeting; and informed residents about road closures in the community. *See* Ex. 1 at 3–5.

The Page has approximately 3,000 followers. Ex. 1 at 1. Alderman Lennon has enabled the interactive features of the Page, which allow visitors to comment on his posts or send the Page a direct message through Facebook. *Id.* Many Berwyn residents participate in the comments sections that appear under Alderman Lennon's posts, expressing opinions, asking questions, and engaging in debate. *Id.* at 6–9 (examples of posts that received more than 100 comments and reactions).

Alderman Lennon posts on his Facebook Page nearly every day, oftentimes several times a day, to share photos of himself appearing at events in his official capacity as the 1st Ward Alderman, information about local events, goings on in City government, and other matters of interest to residents of the City of Berwyn. Ex. 1 (screenshots of representative posts). Each post receives reactions (*e.g.*, "thumbs up" or "heart" reactions) from users who follow the Page, and posts are followed by a comments section in which constituents can ask follow-up questions, react to the posts, and debate viewpoints. *Id.*

In an effort to suppress dissent in this forum, Alderman Lennon blocks individuals such as Plaintiffs whom he perceives as critics or political opponents from interacting with the Page. Ex. 2, List of Blocked Users Received in Response to FOIA Request. Blocked individuals cannot react to or comment on Alderman Lennon's posts; send Alderman Lennon a message through Facebook; tag Alderman Lennon's Page in a post on their own Facebook accounts; or respond to comments posted by others on Alderman Lennon's Facebook Page.

Alderman Lennon has not posted any rules or standards for users who visit the Page—*e.g.*, limitations on how often one can post or comment, guidance about permissible topics of conversation, and/or community standards about language and civility.

### III.    Plaintiff Luz Chavez

Plaintiff Luz Chavez is a Berwyn resident with lifelong ties to Berwyn. Ex. 3, Decl. of Chavez, at ¶1. She grew up there and has resided there for the past six years. *Id*. Chavez is a well-known activist in Berwyn politics. *Id*. at ¶2. She regularly attends City Council meetings. Her activism in Berwyn involves a variety of issues including advocating for fiscal responsibility and transparency in City government; supporting appropriate public health measures in response to the COVID-19 pandemic; organizing aid for persons and businesses adversely affected by construction in the City; promoting civic and democratic engagement in Berwyn municipal elections; advocating for racial justice and police accountability; and exposing patronage and nepotism in City government. *Id*.

Chavez has been an outspoken critic of Alderman Lennon and his political party, the Democratic Citizens of Berwyn. *Id*. at ¶¶3-4. Chavez is involved with a community organization and independent political action committee called Rizoma Collective, which advocates for progressive policies and the election of independent candidates for office. *Id*. Chavez also participated in a rally and march with members of Berwyn's LGBTQ+ community in protest of Alderman Lennon emblazoning his political party logo and name on the City's official Pride Flags. *Id*.

Chavez runs the Yo Soy Berwyn Facebook Page to distribute community news and information about City Council and Ward meetings to Spanish-speaking residents of Berwyn. *Id*. at ¶5.

Chavez is interested in following Alderman Lennon's Facebook Page because he is a powerful and highly visible member of Berwyn City Council and the chair of the Finance and Budget Committees on the Council, which holds significant sway over issues relevant to Chavez. Alderman Lennon also formerly chaired the Council's Outreach committee, which is responsible for communication with Spanish-speaking residents, an issue of particular importance to Chavez. *Id*. at ¶6.

Alderman Lennon has blocked Chavez from interacting with his Facebook Page and has also blocked other members of the Rizoma Collective and activists in the community who hold different political beliefs from him. *Id*. at ¶7. Chavez has been blocked from the Page since 2019 and remains blocked today. *Id*. In a Facebook post from his personal account, Alderman Lennon admitted that he blocked Chavez from his Aldermanic Facebook Page asking her "why would you want to be a fan?" Ex. 5.

As a result of being blocked from Alderman Lennon's Page, Chavez is excluded from engaging in civic dialogue on issues of importance to her and the community. Ex. 3 at ¶8. For example, on July 20, 2022, Alderman Lennon posted about a hate crime committed by a Berwyn City employee. The post received more than 100 responses and comments. Dozens of community residents reacted to the post, asking Alderman Lennon questions about the investigation, and expressing their varying views. Chavez has been organizing with other members of the community

concerning the Mayor's handling of the incident. She was completely blocked from engaging in the dialogue on Alderman Lennon's Page. *Id.* at ¶8; see also Ex. 1 at 6

On August 28, 2022, Alderman Lennon posted news about a shooting in the 1st Ward. The post received more than 100 comments. Chavez covered the incident for the Yo Soy Berwyn Page, but was prohibited from engaging with the members of the community who were commenting on the incident and the City's response to it on Alderman Lennon's Facebook Page. Ex. 3 at ¶9; Ex. 1 at 7-9

On July 22, 2022, Alderman Lennon posted about an upcoming City Council meeting which included an agenda item regarding a proposed development in the community. Chavez and Rizoma opposed the development due to concerns about an alleged predatory lender that was involved in the deal. Chavez wanted to ask Lennon to vote against the development and encourage other residents to speak out against the lender at the meeting, but she was prohibited from commenting on the post. Ex. 3 at ¶10; Ex. 1 at 10-11.

At times, City Council committee meetings are not announced on the City's official website and are only publicized on Alderman Lennon's Facebook Page. For example, a September 29, 2022, meeting of the City's Budget and Finance Committee was only announced on Alderman Lennon's Page and did not appear on the City's official community calendar. Ex. 3 at ¶11; Ex. 1 at 12. Chavez almost missed the meeting, which she wanted to attend, because she couldn't see Alderman Lennon's post. Ex. 3 at ¶11.

Being blocked from Alderman Lennon's Facebook Page has a significant impact on Chavez's ability to engage in political dialogue with her elected representative and her community and impedes her access to information that is important to her as a resident of Berwyn. *Id.* at ¶12.

## IV. Plaintiff Stephen Taylor

Plaintiff Stephen Taylor is a Berwyn resident and activist with a strong interest in local politics, community development, and social issues. Ex. 4, Decl. of Taylor, at ¶1. Taylor has been an advocate for responsible budgets, affordable housing, and infrastructure improvements in Berwyn. *Id.* at ¶2.

As the chair of the City's Budget and Finance Committees, Alderman Lennon has significant sway over many issues of importance to Taylor, including how the City allocates funding in its annual budget; the City's spending on police; the promotion and retention of employees with histories of misconduct and excessive force; neglected infrastructure improvements; gentrification and affordable housing; and zoning changes and proposed developments in the community. *Id.* at ¶3.

Alderman Lennon blocked Taylor from his Facebook Page in October 2021, and Taylor remains blocked today. *Id.* at ¶4. As a result, Taylor cannot comment on Alderman Lennon's posts about political and social issues that are important to him. *Id.* at ¶¶4-5. For example, Taylor has been blocked from participating in discussions with other Berwyn residents regarding City Council agendas and upcoming votes on matters including City finances, capital expenditures for the police department, promotions of City employees, proposed zoning changes, and

lawsuit settlements. *Id*. Taylor is also excluded from discussions of social issues of interest to him such as LGBTQIA+ events in the community in which Alderman Lennon has played a significant role. *Id*. Taylor would like to add his viewpoints to discussions with other members of the community and to express his opinions to Alderman Lennon. *Id*.

Because he is blocked from the Facebook Page, Taylor's ability to petition his elected representative has been impeded and he is unable to express his viewpoints in dialogue with other residents of the community. *Id*. Prior to bringing this lawsuit, Taylor asked Lennon to unblock him by sending an email to Lennon and his City Council colleagues. *Id*. at ¶7. In addition, Taylor has complained to the City Clerk and the City Attorney regarding his being blocked by Alderman Lennon, but nothing has changed. *Id*.

## ARGUMENT

### I. Preliminary Injunction Standard

To be entitled to a preliminary injunction, a plaintiff must show (1) some likelihood of success on the merits; (2) an inadequate remedy at law; and (3) that irreparable harm is likely if the relief is not granted. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). If the moving party makes this threshold showing, the Court must "proceed[] to a balancing analysis," weighing "the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays*, 974 F.3d at 818. "This balancing process involves a 'sliding scale'

approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in [her] favor, and vice versa." *Id*. As shown below, Plaintiffs meet each of these elements.

## II. Plaintiffs Are Likely to Succeed on the Merits

There are two ways in which Defendant Alderman Lennon's conduct in blocking Plaintiffs from his official Facebook Page violates the First Amendment. First, by singling out certain members of the community for blocking from the Page, Alderman Lennon is engaged in impermissible content-based regulation of speech in a public forum. Second, Alderman Lennon's blocking of Plaintiffs violates the First Amendment because it imposes a viewpoint-based burden on their right to petition the government. As shown below, Plaintiffs are likely to succeed on both theories.

### A. Alderman Lennon Is Engaged in Content-Based Regulation of Speech in a Public Forum in Violation of the First Amendment

Courts considering First Amendment challenges to public officials' regulation of content on their social media pages typically employ a three-step analysis to determine whether the public official's action violates the First Amendment. This analysis takes into account the following: (1) whether the official was acting under color of law; (2) whether the social media page constitutes a public forum to which First Amendment protections apply; and (3) whether the restrictions imposed are properly tailored to serve a governmental interest. *See, e.g., Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1169–83 (9th Cir. 2022) (applying this three-step analysis and concluding that school district trustees violated the First Amendment by

blocking constituents who were critical of them on Facebook); *Knight First Amend. Inst. at Colum. Univ. v. Trump*, 928 F.3d 226, 236 (2d Cir. 2019), vacated as moot *sub nom. Biden v. Knight First Amend. Inst. at Colum. Univ.*, 141 S. Ct. 1220 (2021) (applying a similar analysis and concluding that former President Trump violated the First Amendment by blocking users from interacting with his account on Twitter).

### 1. Alderman Lennon Is Acting Under Color of Law in His Operation of His Official Facebook Page

Pursuant to 42 U.S.C. §1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. §1983. A public official "acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988).

To determine whether an official was acting "under color of law" when regulating a social media page, courts have asked whether the official's actions had a "sufficient nexus" to the performance of public duties "based on the totality of the circumstances." *One Wis. Now v. Kremer*, 354 F. Supp. 3d 940, 950 (W.D. Wis. 2019) (citing *Skinner v. Ry. Labor Executives' Assoc.*, 489 U.S. 602, 614-15 (1989)) (finding that members of the Wisconsin State Assembly acted under color of law when they blocked plaintiff's Twitter account); *see also Davison v. Randall*, 912 F.3d 666, 680 (4th Cir. 2019) (finding that county supervisor acted under color of law when

blocking a citizen on Facebook where the public official "administered the …

Facebook Page to further her duties as a municipal official" by, *inter alia*,

"provid[ing] information to the public about her and the Loudoun Board's official

activities and solicit[ing] input from the public on policy issues she and the Loudoun

Board confront.")

Here, the evidence firmly establishes that Defendant Alderman Lennon acts

under color of law in the operation and regulation of his Facebook Page. The Page

contains numerous indicia that it is being used in furtherance of his performance of

his duties as a public official, including, but not limited to the following:

- The Page is identified as belonging to "Berwyn's 1st Ward Alderman" (Ex. 1);

- The contact information that appears on the Page is Ald. Lennon's official City of Berwyn phone number, office address, and email address (*Id.*);

- Ald. Lennon uses the Page solely for communications related to his role as a government official, such as posting the agendas, times and locations of upcoming City Council Meetings; sharing information about City-sponsored events and programs; sharing public notices from Berwyn City Hall and the Berwyn Police Department; and soliciting citizens' input and feedback on City government functions (*Id.*).

Based on these factors, it is clear that Ald. Lennon is acting under color of law in

prohibiting Plaintiffs from interacting with his Facebook Page.

### 2. Alderman Lennon's Page Is a Public Forum for First Amendment Purposes

"[A] public forum may be created by government designation of a place or

channel of communication for use by the public at large for assembly and speech."

*Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985);

*see also Surita v. Hyde,* 665 F.3d 860, 869 (7th Cir. 2011) (public forums are

"locations or channels of communication that the government opens for use by the public for expressive activity."). In determining whether government officials have created a designated public forum under the First Amendment, courts consider the forum's compatibility with expressive activity and whether the government's overall "policy and past practice" shows that the forum is intended to be used for speech by the public. *Cornelius*, 473 U.S. at 802.

Here, there are three principal reasons to conclude that Alderman Lennon's Facebook Page (particularly the "comments" section that appears under each post) is a designated public forum to which First Amendment protections apply.

First, the Supreme Court has explicitly held that social media websites are the "most important places" where First Amendment activities take place today. In *Packingham v. North Carolina*, 137 U.S. 1730 (2017), the U.S. Supreme Court considered the constitutionality of a North Carolina law that made it illegal for a person on the sex offender registry to access social media websites. The Court found the statute unconstitutional, writing as follows:

> While in the past there may have been difficulty in identifying the most important places … for the exchange of views, today the answer is clear. It is cyberspace—the vast democratic forums of the Internet in general, and social media in particular.
>
> On [social media], users can debate religion and politics with their friends and neighbors … look for work, advertise for employees, or review tips on entrepreneurship … and petition their elected representatives and otherwise engage with them in a direct manner. … In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics "as diverse as human thought.

*Id.* at 1735-36 (*citing Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997)). Thus, it is clear that the Supreme Court regards social media platforms as important public fora for expression.

Second, in the specific context at issue here (*i.e.*, government officials' social media pages), numerous courts have concluded that, where, as here, a government official "uses a social media account for official business, the interactive portions of the social media platforms are public forums for First Amendment purposes." *Czosnyka v. Gardiner*, No. 21-cv-3240, 2022 U.S. Dist. LEXIS 24070, at *5-6 (N.D. Ill. Feb. 10, 2022) (plaintiffs stated a claim that a Chicago alderman violated their First Amendment rights by blocking them from his official Facebook Page) (citing *Davison*, 912 F.3d at 682; *Knight First Amendment Inst.*, 928 F.3d at 237; *Felts v. Reed*, 504 F.Supp.3d 978, 985 (E.D. Mo. 2020); *One Wisconsin*, 354 F.Supp. 3d at 953).

Third, Alderman Lennon's own conduct indicates that he regards the comments sections of his Facebook Page as a forum for speech by members of the public. This is so in at least three respects.

- Alderman Lennon chose to use a Facebook Page to communicate with his constituents regarding government business. Facebook Pages are inherently interactive and are designed to solicit feedback in the form of comments, posts and messages. Anyone with a Facebook account who is not blocked can interact with his Page by commenting on posts; tagging the Page; or sending the Page a message. Alderman Lennon is not required to maintain a Facebook Page. Nor is he required to allow comments on his Facebook Page. If he wanted to create a one-way channel of communication, he could turn comments off on his Facebook posts. In the alternative, he could use a traditional website (*i.e.*, not a social media page) to publish press releases without inviting feedback and comments. His choice to establish a Facebook

Page and leave its interactive elements enabled demonstrates that Alderman Lennon has intentionally created a public forum;

- Alderman Lennon allows and encourages comments on his Facebook Page. Hundreds of people participate actively in the comments sections on his posts. *See, e.g.*, Ex. 1 at 6 and 9 (examples of posts that received more than 100 comments and reactions). Moreover, Lennon has actively invited and solicited public feedback on his Facebook posts. *Id.* at 10 (inviting citizens to contact him in anticipation of an upcoming City Council meeting); *id.* at 1 (stating that he is "here to listen");

- Alderman Lennon himself engages with the interactive elements of the Facebook platform by responding to comments on his Facebook posts. For example, if a constituent asks a question or seeks additional information, Alderman Lennon responds with follow-up information. *See* Ex. 1, at 12.

In short, Defendant Lennon elected to use an interactive platform to discuss government business and decided to make use of the platform's interactive features. These facts show that Defendant Alderman Lennon purposefully created a forum for speech by constituents and members of the general public.

As the Supreme Court emphasized in *Packingham*, social media platforms offer "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," in part because these platforms permit citizens to "engage with [their elected representatives] in a direct manner." *Packingham*, 137 S. Ct. at 1737. Defendant Lennon's decision to use Facebook to communicate with his constituents is powerful evidence of an intent to create a forum open to speech.[1]

---

[1]  Other Courts have agreed that government officials violate the First Amendment when they block users from interacting with their official social media pages. *See e.g., Faison v. Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020) (granting a preliminary injunction to plaintiffs who had been blocked from a sheriff's Facebook page); *Scarborough v. Frederick Cty. Sch. Bd.*, 517 F. Supp. 3d 569 (W.D. Va. 2021) (plaintiff stated a First Amendment claim regarding being blocked from a school board Facebook Page); *Felts v. Reed*, 504 F.Supp.3d 978, 985 (E.D. Mo. 2020) (plaintiff stated a claim that an alderman violated her First Amendment rights by blocking her on Twitter); *Robinson v. Hunt Cnty., Tex.*, 921 F.3d 440,

### 3. Defendant Alderman Lennon Is Engaged in Unlawful Content-Based Regulation of Speech

Where, as here, a government official has created a designated public forum, there are limited circumstances in which he can restrict speech in that forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983) (designated public forums are subject to the same standards as traditional public forums). Specifically, the government can impose "reasonable time, place and manner regulations" on speech within the forum. *Id.* at 46. What the government cannot do, however, "is exclude speech based on its content, unless it can meet the extraordinarily high burden of proving exclusion is 'necessary to serve a compelling state interest and that it is narrowly drawn to achieve that interests.'" *One Wisconsin*, 354 F. Supp. at 955 (quoting *Perry*, 460 U.S. at 45). Put another way, "the government's reason for content-based restrictions must satisfy strict scrutiny." *Id.*; *see also Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("content-based laws—those that target speech based on its communicative content—are

---

448 (5th Cir. 2019) (plaintiff sufficiently pled that the official Facebook page of a sheriff's office was a public forum and deletion of comments was unconstitutional viewpoint discrimination); *Anderson v. Hansen*, 519 F. Supp. 3d 457, 468 (E.D. Wis. 2021) (a school district's decision to delete a parent's comments on a Facebook post was "an unlawful form of regulation within a designated public forum."); *Goodman v. Harness*, No. 3:22-CV-3017, 2022 U.S. Dist. LEXIS 107903, at *17-18 (W.D. Ark. June 16, 2022) (plaintiff stated a First Amendment claim where he alleged that a public official blocked him from his Facebook page); *Tanner v. Ziegenhorn*, No. 4:17-cv-780-DPM, 2021 U.S. Dist. LEXIS 187782, at *15 (E.D. Ark. Sep. 30, 2021) (state police "violated the First Amendment … in blocking [plaintiff] from the State Police's Facebook page").

presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.")

The Seventh Circuit has held that the exclusion of a particular speaker who is otherwise "within the class to which the designated public forum was available" is a form of impermissible content-based discrimination. *Surita*, 655 F.3d at 870 (finding an impermissible content-based restriction where a mayor blocked an individual from speaking at a city council meeting); *see also, One Wisconsin*, 354 F. Supp. 3d at 955-56 (finding that general assembly members engaged in impermissible content-based restriction of speech where they "blocked a select number of Twitter accounts," which supported an inference that they "selectively blocked plaintiff for a specific reason and not as a matter of happenstance.")

Here, the evidence shows that Alderman Lennon is engaged in impermissible content-based regulation of speech on his Facebook Page because he has selectively decided to ban particular users (in particular, those he deems to be his political opponents or critics) from commenting on the Page. *See, e.g.*, Ex. 3, Decl. of Chavez at ¶4, 7 (stating that many of the individuals blocked from Ald. Lennon's Page are members of the Rizoma Collective, an independent political organization that has opposed Lennon and his political party). There is no evidence that blocking Plaintiffs was necessary to achieve a compelling government objective. Plaintiffs have never given any indication that they will use the forum for anything other than appropriate, on-topic engagement with Alderman Lennon and fellow Berwyn residents on matters of public concern.

Alderman Lennon has the option to adopt a content-neutral policy to regulate postings on his Facebook Page, but it is not permissible under the First Amendment for him to selectively pick and choose who may participate in the forum.

## B. Alderman Lennon Is Violating the First Amendment's Petition Clause

Independent of whether the Facebook Page is a public forum, Alderman Lennon's blocking of Plaintiffs also violates the First Amendment because it imposes a viewpoint-based burden on their right "to petition the Government for a redress of grievances." U.S. Const. Amdt. I. Though the right to speak and the right to petition are related, they are not duplicative: "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). Accordingly, the Supreme Court has cautioned courts not to "presume ... that Speech Clause precedents necessarily and in every case resolve Petition Clause claims." *Id.*

Defendant Lennon's blocking of the Plaintiffs violates the Petition Clause because the Facebook Page is, in addition to being a forum for discussion, a channel through which constituents can petition their elected official directly. Indeed, the Supreme Court has observed that the interactive features of social media make these platforms especially suited to this purpose. *Packingham*, 137 S. Ct. at 1735

("users can petition their elected representatives and otherwise engage with them in a direct manner.").

The evidence here shows that Plaintiffs seek to use the Facebook Page to lobby Alderman Lennon with regard to his votes on matters of public concern. *See, e.g.*, Ex. 3, Decl. of Chavez, at ¶10 (stating that she sought to comment on Ald. Lennon's post about an upcoming City Council meeting in order to discourage him from voting in favor of a proposed development); Ex. 4, Decl. of Taylor, at ¶4 (stating that he wanted to express his views to Ald. Lennon regarding upcoming votes on matters including City finances, capital expenditures for the police department, promotions of City employees, proposed zoning changes, and lawsuit settlements).

Plaintiffs do not contend that Alderman Lennon is required to make his Facebook Page available as a channel through which members of the public may exercise their Petition Clause rights. Nor do Plaintiffs contend that the First Amendment requires Alderman Lennon to respond to the public's petitions, or even to read them. Having made the channel available, however, Alderman Lennon cannot close the channel solely to those who disagree with him or his policies. *See Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 680 (1996) (noting that "the government has no legitimate interest in repressing" "ordinary citizens['] ... viewpoints on matters of public concern"); *Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*, 508 U.S. 384, 394 (1993) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *Reed*, 576 U.S. at 163 ("a municipal

government … has no power to restrict expression because of its message, its ideas, its subject matter, or its content.") (citation omitted); *see also Mirabella v. Villard*, 853 F.3d 641, 649-50 (3d Cir. 2017) (holding retaliation for petition activity unconstitutional).

For all of these reasons, Plaintiffs have a likelihood of success on their First Amendment claims.

## III. Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief

Plaintiffs are suffering irreparable harm and will continue to suffer irreparable harm unless an injunction is granted. They are currently blocked from Alderman Lennon's Facebook Page, which prohibits them from engaging in First Amendment protected activities such as commenting on matters of public concern and petitioning their elected government official regarding his performance of his official duties.

Harm is irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017) (*quoting Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)). In the First Amendment context, courts have consistently held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590-91 (7th Cir.2012) (a plaintiff who is prohibited from engaging in First Amendment protected activity successfully demonstrates

irreparable injury). When deprivation of First Amendment rights is alleged, "most courts hold that no further showing of irreparable injury is necessary." *Ezell v. City of Chicago*, 651 F. 3d 684 (7th Cir. 2011) (*quoting* Alan Wright *et al.*, Federal Practice and Procedure § 2948.1 (2d ed. 1995)); *see also Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 507 (7th Cir. 1998) ("[Plaintiff] lacks an adequate remedy at law as any post-election remedy would not compensate it for the loss of the freedom of speech.")

## IV. The Balance of Equities Tilts in Plaintiff's Favor

Turning to the final factor in the preliminary injunction analysis, the balance of harms tilts strongly in Plaintiffs' favor. As the Seventh Circuit has explained, "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *see also Alvarez*, 679 F.3d at 589-90 ("[T]he public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.") Nor would an injunction harm the Defendant, who has no legitimate interest in infringing upon the Plaintiffs' rights. *Joelner v. Vill. Of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004).

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court grant a preliminary injunction prohibiting Defendant from continuing to block them from his Facebook Page and any other relief the Court deems appropriate.

Respectfully submitted,

/s/ Adele D. Nicholas
/s/ Mark G. Weinberg
*Counsel for Plaintiff*

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869
adele@civilrightschicago.com

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net